Slip Op. 08-58
UNITED STATES COURT OF INTERNATIONAL TRADE

```
-----------------------------x
NAKORNTHAI STRIP MILL PUBLIC  :
COMPANY LIMITED,              :
                             :
          Plaintiff,         :
                             :     Before: Pogue, Judge
          v.                 :     Court No. 07-00180
                             :
UNITED STATES,               :
                             :     Public Version
          Defendant,         :
                             :
UNITED STATES STEEL          :
CORPORATION,                 :
                             :
          Defendant-         :
            Intervenor.      :
-----------------------------x
```

**OPINION**

[Plaintiff's Motion for Judgment on the Agency Record granted-in-part and denied-in-part.]

Dated: May 28, 2008

Vinson & Elkins (Kenneth J. Pierce, Robert L. LaFrankie, Victor S. Mroczka) for the Plaintiff.

Gregory G. Katsas, Acting Assistant Attorney General; Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Claudia Burke); Matthew D. Walden, Attorney, Of Counsel, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for the United States Department of Commerce

Skadden, Arps, Slate, Meagher & Flom LLP (Robert E. Lighthizer, John J. Mangan, Jeffrey Gerrish, Luke A. Meisner) for the Defendant-Intervenor.

**Pogue, Judge**: In this action, Plaintiff Nakornthai Strip Mill

Public Company Limited ("Nakornthai") challenges the final results

of the Department of Commerce's ("Commerce") administrative review

of the antidumping order on Nakornthai's imports. Certain Hot-Rolled Carbon Steel Flat Products from Thailand, 72 Fed. Reg. 27,802 (Dep't Commerce May 17, 2007)(final results and partial recision of antidumping duty administrative review)("Final Results"). Specifically, Nakornthai challenges Commerce's selection of the invoice date as the date of sale in the United States for Plaintiff's merchandise.[1] Because of Commerce's determination that the material terms of the contract for Plaintiff's sales were not final by the contract date, Commerce utilized the invoice date as the date of sale.

The court finds that Commerce's conclusion identifying the potentially material terms of Plaintiff's contract is based on the agency's reasonable interpretation of its own regulation; therefore, the court affirms this legal conclusion. However, because Commerce's factual finding of finality of the terms of sale is incomplete, the court remands this issue for further consideration. The court also refrains from adjudicating Nakornthai's request for consideration of alternate dates--other than the contract date-- as the date of sale because Nakornthai failed to exhaust its administrative remedies on these claims.

---

[1] "In general terms, an antidumping analysis involves a comparison of export price or constructed export in the United States with normal value in the foreign market." 19 C.F.R. § 351.401(a) The identification of a "date of sale" for U.S. price may affect its comparison with sales in the foreign or "home" market, for example, if exchange rates are changing during the period of review.

## Background

The original antidumping investigation, which gave rise to the proceeding here, involved hot-rolled carbon steel products imported from Thailand by Sahaviriya Steel Industries ("SSI"). In the initial investigation, Commerce found that SSI was dumping the subject merchandise and imposed a duty of 4.44 percent. <u>Certain Hot-Rolled Carbon Steel Flat Products From Thailand</u>, 66 Fed. Reg. 59,562, 59,563 (Dep't Commerce Nov. 29, 2001) (notice of antidumping duty order).[2] After Commerce published an opportunity to request an administrative review of the order, <u>see</u> <u>Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation</u>, 70 Fed. Reg. 65,883 (Dep't Commerce Nov. 1, 2005) (opportunity to request administrative review); <u>see</u> <u>also</u> Section 751 of the Tariff Act of 1930, 19 U.S.C. § 1675,[3] Defendant-intervenor U.S. Steel, and Nucor Corporation ("Nucor"), pursuant to 19 C.F.R. § 351.213(b)(1), requested an administrative review for the period

_____

[2] The November 29, 2001 antidumping order originally subjected SSI to a 4.44 percent antidumping duty, which was subsequently lowered to 3.86 percent. Nakornthai was subject to the same antidumping duty rate, under a separate "all others" rate category, up until the time it received its own company-specific rate in the proceeding challenged here. <u>See, e.g.</u>, <u>Final Results</u>, 72 Fed. Reg. 27,802 and accompanying Issues and Decision Memorandum 2, <u>available at</u> http://ia.ita.doc.gov/frn/summary/THAILAND/E7-9526-1.pdf ("<u>Issues and Decision Mem.</u>").

[3] Further citation to the Tariff Act of 1930 are to the relevant provisions of Title 19 of the U.S. Code, 2000 edition.

of November 1, 2004, through October 31, 2005.[4] Commerce granted

the request, see Initiation of Antidumping and Countervailing Duty

Administrative Reviews and Request for Revocation in Part, 70 Fed.

Reg. 76,024, 76,025 (Dep't Commerce Dec. 22, 2005), and issued an

initial antidumping questionnaire ("Part A") to Nakornthai on

January 3, 2006. Three other sets of questionnaires followed, Parts

B, C, and D, and by March 9, 2006, Nakornthai had also responded to

these supplemental questionnaires.

Nakornthai's questionnaire responses indicated that, during

the period of review, Nakorthai contracted with one wholesaler of

metals and metal ores, to import its products. This contract was

the only U.S. sale of the subject merchandise that Nakornthai made

during the period of review. Pl.'s Mot. for J. on the Agency R. 2

("Pl.'s Mot."); Def.-Intervenor's Mem. in Opp. to Pl.'s Mot. for J.

on the Agency R. 1 ("Def.-Intervenor's Opp. Mem."). Nakornthai's

original contract, dated in a specific month in 2004, identified

---

[4]19 C.F.R. § 351.213(b) states:

Request for administrative review. (1) Each year during
the anniversary month of the publication of an
antidumping or countervailing duty order, a domestic
interested party or an interested party described in
section 771(9)(B) of the Act (foreign government) may
request in writing that the Secretary conduct an
administrative review under section 751(a)(1) of the
Act of specified individual exporters or producers
covered by an order . . . if the requesting person
states why the person desires the Secretary to review
those particular exporters or producers.

19 C.F.R. § 351.213(b)(1).

multiple line items designating products to be shipped to several
end users in the United States.  The parties later made three
changes to the contract.  The first amendment, made the next month
in 2004, removed the specification of the range of quantities to be
purchased for each item to be sold under the contract (the "per-
item tolerance level"),[5] leaving only a total quantity tolerance
level. The second amendment, made in yet again the following month,
changed the payment terms, and the third amendment, made in yet
again the following month, changed both the expiration date on the
letter of credit and the last shipment date for the merchandise. In
other words, in each of the three months following the original
contract, the parties amended its terms.

Nakornthai shipped its products under this contract shortly
after the third contractual amendment.  The day after the last date
of the shipments, Nakornthai issued a final invoice for its
products.

Nakornthai's responses to Commerce's questionnaires identified
its original contract date as the United States date of sale.
Attach. to Letter from Kenneth J. Pierce, Willkie Farr & Gallagher
LLP, on behalf of Nakornthai; to the Honorable Carlos M. Gutierrez,
Secretary of Commerce, Re: <u>Antidumping Duty Administrative Review
of Certain Hot-Rolled Carbon Steel Flat Products from Thailand:</u>

---

[5] The "tolerance" level is expressed as a quantity, plus or
minus (+/-) a specified percentage.

Resp. to Section A of the Department's Questionnaire (Feb. 14, 2005), C.R. Doc. 3 at A-3 ("Nakornthai's Resp. to Part A Questionnaire"). Nakornthai also stated in its responses that it considered the contract's amendments to be minimal and not material to the overall contract and sale. Id. at A-27; Pl.'s Resp. to the Dep't's July 26, 2006, Third Supplemental Questionnaire Re: Section C, Aug. 7, 2006, at 6.

Commerce made a preliminary determination that Nakornthai's products had been sold at less than fair value, i.e., a dumping determination, for the period of review. Commerce's preliminary determination did not adopt the contract date as the date of sale as Nakornthai had proposed in its questionnaire responses. Rather, Commerce, in calculating the dumping margin, used the final invoice date as the U.S. date of sale rather than the original contract date. Certain Hot-Rolled Carbon Steel Flat Products from Thailand, 71 Fed. Reg. 65,458, 65,461-62 (Dep't Commerce Oct. 31, 2006) (preliminary results of antidumping duty administrative review and rescission in part)("Preliminary Results"). In addition, Commerce determined that the amendments made material changes to the contract. In coming to these conclusions, Commerce reasoned, first, that department regulations created a presumption in favor of using the invoice date as the date of sale. Furthermore, Commerce reasoned, the fact that the parties had made three amendments to the contract in the space of a few months meant that the terms of

the contract were not settled until the commercial invoice actually issued.

Commerce's preliminary results also reasoned that the amendments to the contract constituted material changes to the terms of sale because they "altered the payments terms and the letter of credit." Mem. From Stephen Bailey, Case Analyst, to File, Preliminary Results Analysis for Nakornthai Strip Mill Public Co. Ltd: Antidumping Duty Administrative Review of Certain Hot-Rolled Carbon Steel Flat Products from Thailand, C.R. Doc. 39, 2 (Dep't Commerce Oct. 31, 2006)("Preliminary Results Mem."). In Commerce's view, the fact that material terms were being changed throughout the period of review also supported its choice of the invoice date as the date of sale; not only were the terms of the contract not finalized until the invoice issued, but also, the changes being made affected quantities at the heart of the contract. Def.'s Mem. in Opp. to Pl.'s Mot. for J. Upon the Admin. R., 8-9 ("Def.'s Opp. Mem.").

After Commerce made its preliminary determination, Nakornthai submitted a case brief, pursuant to 19 C.F.R. § 351.309(c).[6]  In

---

[6]19 C.F.R. § 351.309(c)(2) specifies:

The case brief must present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination or final results, including any arguments presented before the date of publication of the preliminary determination or preliminary results. As part of the case brief, parties
(continued...)

its case brief, Nakornthai objected to Commerce's use of the invoice date and argued generally for an alternative date of sale to be used instead of the invoice date. Specifically, the company again proposed that Commerce use the date on which the contract was formed, i.e., the original contract date. Case Brief of Nakornthai Strip Mill Public Company Limited, 6-7 (Jan. 8, 2007)("Nakornthai Case Br.").

Nakornthai also objected to Commerce's determination that the amendments to the contract affected the material terms of the sale. Nakornthai argued that "[n]one of [the changes] impacted the material terms of sale (i.e., price and quantity)." Nakornthai Case Br. 3. "In other words, there is no variance in the material terms of sale from the contract to the invoice." Id. at 4. The contract's first amendment "merely modified the tolerance level in the contract from per item to per total." Id. While the contract's second amendment changed the timing of the payment, and the third amendment changed the letter of credit's expiration date and the last date of shipment, Nakornthai maintained that the contract's "material terms," i.e., price and quantity, were not changed by any of the three amendments. Id.

---

[6](...continued)
are encouraged to provide a summary of the arguments not to exceed five pages and a table of statutes, regulations, and cases cited.

In its final determination, Commerce continued to use the invoice date as the U.S. date of sale, based on its determination that one of the contract's amendments made a material change to the contract. <u>Final Results</u>, 72 Fed. Reg. 27,802, and accompanying Proprietary Arguments from the Issues and Decision Memorandum for the Final Results of Certain Hot-Rolled Carbon Steel Flat Products from Thailand 13-14 ("<u>Proprietary Issues and Decision Mem.</u>") Commerce reasoned that by eliminating the tolerance levels for individual line items in the contract, Nakornthai could potentially alter the mix of products ordered.[7] The final dumping determination issued on May 7, 2007. <u>Final Results</u>, 72 Fed. Reg. 27,802.

Nakornthai now seeks review of Commerce's determination, challenging it as contrary to law and unsupported by substantial evidence. Specifically, as the court understands Plaintiff's complaint, pursuant to USCIT R. 56.2, Plaintiff seeks judgment on the agency record, declaring contrary to law Commerce's conclusion that the specification of line-item quantities in Plaintiff's contract for the sale of merchandise imported into the United States was a material term of that contract. Plaintiff also seeks a judgment declaring unsupported by substantial evidence Commerce's

---

[7] Commerce also noted that it was moot whether changes to the payment terms or the letter of credit constituted changes to material sales terms. <u>See</u> <u>Proprietary Issues and Decision Mem.</u> 14.

determination that, because said line-item quantities were subject
to change after the contract was signed, the material terms of
Plaintiff's contract were not final or established by the contract
date.


## Jurisdiction and Standard of Review

28 U.S.C. § 1581(c) provides jurisdiction for the court's
review of civil actions brought under Section 516A of the Tariff
Act of 1930. 19 U.S.C. § 1516a. Under 19 U.S.C. § 1516a(a), the
Court reviews determinations made, pursuant to 19 U.S.C. § 1675, by
the Department of Commerce during its administrative review. See 19
U.S.C. § 1516a(a)(2)(A)(i)(I) and (B)(iii).

In such a review, the court will uphold "any determination,
finding or conclusion" which the agency has made unless it is
"unsupported by substantial evidence on the record, or otherwise
not in accordance with law." 19. U.S.C. § 1516a(b)(1)(B). Fujitsu
Gen. Ltd. v. United States, 88 F.3d 1034, 1038 (Fed. Cir.
1996)(quoting 19 U.S.C. § 1516a(b)(1)(B)).


## Discussion

To apply the standard of review to Nakornthai's claim, the
court will divide its discussion into four parts. First, the court
will summarize the statutory and regulatory provisions relevant to
Commerce's determination. Second, the court will explain its

conclusion that Commerce's interpretation of the materiality
provision in the relevant regulation is reasonable and therefore in
accordance with law. Third, the court will consider Commerce's
factual finding of finality of the terms of Nakornthai's sale and
whether that finding is supported by substantial evidence in the
record. Fourth, the court will discuss its decision not to further
adjudicate Nakornthai's request for consideration of alternate
dates--other than the contract date-- as the date of sale because
Nakornthai has failed to exhaust its administrative remedies on
these claims.


**A. Relevant Statuory and Regulatory Provisions**

The statutory provisions relevant to Nakornthai's challenge to
Commerce's determination of a date of sale are 19 U.S.C. §§ 1673
and 1677a. These provisions leave the precise definition of "date
of sale" to the agency. Section 1677a(a), for example, reads,
"[t]he term 'export price' means the price at which the subject
merchandise is first sold (or agreed to be sold) before the date of
importation by the producer or exporter of the subject merchandise
. . . ." 19. U.S.C. § 1677a(a). This provision does not determine
whether the date of sale is the contract date or invoice date; it
could be either, if, as in the present case, both the date of sale
and the date of invoice occurred before the merchandise was
actually brought into the U.S. Because the statute is ambiguous,

the court will defer to Commerce's reasonable interpretation of the statute. <u>Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984).

Commerce's interpretation is contained in its regulations which state a presumption in favor of the use of the invoice date as the date of sale. 19 C.F.R. § 351.401(i)(2007).[8] <u>See Hornos Electricos de Venezuela, S.A. v. United States</u>, 27 CIT 1522, 1535-36, 285 F. Supp. 2d 1353, 1366-67 (2003).  Consequently, unless the party seeking to establish a date of sale other than the invoice date produces sufficient evidence to establish, to Commerce's satisfaction, that "a different date better reflects the date on which the exporter or producer establishes the material terms of sale," Commerce will use the invoice date as the date of sale. 19 C.F.R. § 351.401(i)(2007); <u>Accord Hornos Electricos de Venezuela</u>, 27 CIT at 1537, 285 F. Supp. 2d at 1367.

In Nakornthai's case, Commerce determined that the quantity tolerance level specified in the contract was a "material term[] of

---

[8]That section reads:

> in identifying the date of sale of the subject
> merchandise or foreign like product, the Secretary
> normally will use the date of invoice, as recorded in
> the exporter or producer's records kept in the ordinary
> course of business. However, the Secretary may use a
> date other than the date of invoice if the Secretary is
> satisfied that a different date better reflects the
> date on which the exporter or producer establishes the
> material terms of sale.

19 C.F.R. § 351.401(i).

[the] sale." Therefore, the next issue is whether Commerce's determination that the quantity tolerance level constituted a material term of Nakornthai's contract is a reasonable interpretation of Commerce's regulation and is therefore in accordance with law.

## B. Commerce's Determination of Potential Materiality is Reasonable

From the beginning of the administrative process, Nakornthai has argued that the changes it had made to the contract were minimal and therefore immaterial. In response to the first questionnaire it received from Commerce, Nakornthai stated, "during [the fourth period of review], for U.S. sales, there were only two minor changes, (i.e., tolerance applicability and payment terms) after the terms of the contract were agreed upon . . . ." Nakornthai's Resp. to Part A Questionnaire C.R. Doc. 3 at A-27.[9]

The problem with this argument is that it conflates a factual issue, i.e., the extent of the actual change in contract terms,

---

[9]In response to a question in Commerce's third questionnaire, Nakornthai also stated that all the copies of the final invoices that it had provided to its wholesaler "support a finding of contract date as the date of sale because all material terms of sale were set in the contract (i.e., there is no variance in material terms between the contract and the invoices.)" Attach. to Letter from Kenneth J. Pierce, Willkie Farr & Gallagher LLP, on behalf of Nakornthai; to the Honorable Carlos M. Gutierrez, Secretary of Commerce, Re: Antidumping Duty Administrative Review of Certain Hot-Rolled Carbon Steel Flat Products from Thailand: Resp. to the Department's Third Supplemental Questionnaire Re: Section C (Aug. 7, 2006), C.R. Doc. 30 at 6.

with a legal issue, i.e., whether a particular contractual term is a "material" term of sale.

Commerce's preliminary results acknowledged Nakornthai's argument that the changes contained in the contract's amendments were minimal, but noted that one of these amendments changed the tolerance level for the products at issue. Preliminary Results Mem., C.R. Doc. 39, 2.  On the strength of this change, Commerce determined that "material" changes to the contract had occurred as a result of the contract's amendments. Id. Nakornthai challenged this finding in its case brief before Commerce, arguing that the only material terms of a contract were price and quantity, to which there had been no changes. Attach. to Letter from Kenneth J. Pierce, Willkie Farr & Gallagher LLP, on behalf of Nakornthai; to the Honorable Carlos M. Gutierrez, Secretary of Commerce, Re: Certain Hot-Rolled Carbon Steel Flat Products from Thailand: Case Brief of Nakornthai Strip Mill Public Co. Ltd. (Jan. 8, 2007), C.R. Doc. 45  at 3.

In its rebuttal brief, U.S. Steel cited precedent to argue that Commerce had a long history of considering tolerance to be a material term. Attach. to Letter from Robert E. Lighthizer, Skadden, Arps, Slate, Meagher & Flom, LLP, on behalf of U.S. Steel; to the Honorable Carlos M. Gutierrez, Secretary of Commerce, Re: Fourth Administrative Review of Certain Hot-Rolled Carbon Steel Flat Products from Thailand (Jan. 16, 2007), C.R. Doc 48 at 5, n.

16 ("<u>U.S. Steel Case Br.</u>")(citing <u>Certain Hot-Rolled Steel Flat</u>

<u>Products from Thailand</u>, 66 Fed. Reg. 49,622 (Dep't Commerce Sept.

28, 2001)(notice of final determination of sales at less than fair

value)("<u>Final Results of Original Investigation</u>"), and accompanying

Issues and Decisions Mem. (Comment 9)(where the contract has a

built in tolerance of +/- 10 percent and quantity changes occurred

within such delivery tolerances, "we agree with petitioners that

any differences between the quantity ordered and the quantity

shipped which fall within the tolerance specified by the entire

contract do not constitute changes in the material terms of

sale.")); <u>see also</u> <u>Certain Hot-Rolled Flat-Rolled Carbon Quality</u>

<u>Steel Products from Brazil</u>, 64 Fed. Reg. 38,756, 38,768 (Dep't

Commerce July 19, 1999)(notice of final determination of sales at

less than fair value)("[t]he Department considers the date of sale

to be the date on which all substantive terms of sale are agreed

upon by the parties. This normally includes the price, quantity,

delivery terms and payment terms."). U.S. Steel also argued that

the elimination of the per item tolerance in the contract's

amendments affected the product mix, a term which Commerce also

considers to be material. <u>U.S. Steel Case Br.</u> 5. Commerce agreed

with U.S. Steel's logic and precedent and determined that changes

in tolerance could lead to changes in quantity, and therefore

constitute material changes.

As noted above, the determination of whether a change in line-item quantities is "material" for purposes of Commerce's date of sale regulation is a <u>legal</u> issue, i.e., it involves Commerce's interpretation of its own regulation. Here, Commerce has interpreted "material terms of sale" to include the specification of a quantity tolerance level. Such a determination is reviewed to determine whether it is in accordance with law. To the court, Commerce's legal determination is reasonable because quantity tolerance level may reasonably be viewed as specifying the amount or quantity of the merchandise to be shipped. Accordingly, the quantity tolerance may reasonably be considered material to the terms of sale. <u>See</u> <u>SeAH Steel Corp. v. United States</u>, 25 CIT 133, 135 (2001)(finding line-item quantity data necessary to a determination of material  terms of sale). Considered in this light, Commerce's adherence to its precedent, in its regulatory interpretation here, is reasonable. <u>See</u> <u>Royal Thai Government v. United States</u>, 436 F.3d 1330, 1340 (Fed. Cir. 2006)(deferring to Commerce's reasonable interpretation of its regulation.)

Nakornthai asserts that Commerce has not adhered to the use of the invoice date in every case that has come before it, and has used initial contract date even in cases where amendments to the contract have been made after the initial contract date. Pl.'s Reply Br. 5 (citing <u>Final Results of Original Investigation</u>, and accompanying Issues and Decision Mem. (Comment 9); <u>Steel Concrete</u>

Reinforcing Bars from Latvia, 71 Fed. Reg. 7,016 (Dep't Commerce
Feb. 10, 2006) (notice of final results of antidumping duty
administrative review), and accompanying Issues and Decision Mem.,
11; Steel Concrete Reinforcing Bars from Latvia, 71 Fed. Reg.
74,900 (Dep't Commerce Dec. 13, 2006)(notice of final results of
antidumping duty administrative review), and accompanying Decision
Mem. (Cmt. 2).

        The court notes that although the cases to which Nakornthai
cites are indeed cases where Commerce used the contract date rather
than the invoice date, they are also cases in which Commerce
considered a number of factors before arriving at the use of the
contract date. These factors, such as whether there were changes to
material terms such as price and quantity, and how significant
these changes were, are the same factors that Commerce used in
coming to its conclusion to use the invoice date in the present
case. Here, Commerce examined these factors and determined that the
first amendment to the contract changed the quantity tolerance
level, a term which Commerce has a history of considering to be a
material term; as a result, Commerce reasonably determined that the
amendments had the potential to change the material terms of the
contract.  This much of Commerce's determination is therefore in
accordance with law.

        Commerce's determination, however, must also be supported by
substantial evidence. Accordingly, the court now considers whether

Commerce's choice to use the invoice date as the date of sale, rather than the contract date, was, based on the record in this administrative review, so supported.

## C. Commerce's Factual Finding Regarding the Date on which the Material Terms of Nakornthai's Sale were established is Incomplete.

In choosing a date of sale, Commerce weighs the evidence presented and regularly determines the significance of any changes to the terms of sales involved. <u>See, e.g.</u>, <u>Certain Cut-to-Length Carbon Steel Plate from Romania</u>, 72 Fed. Reg. 6,522 (Dep't Commerce Feb. 12, 2007)(notice of final results of antidumping duty administrative review and final partial rescission), and accompanying Issues and Decision Mem. (Comment 7) (recognizing as not significant one sale of a small quantity outside the specified quantity tolerance level). As Commerce noted in its issues and decision memorandum here, such a determination involves Commerce's consideration of "which date best reflects the date on which the exporter/producer <u>establishes</u> the material terms of sale (i.e., price and quantity)." <u>Proprietary Issues and Decision Mem.</u>, 13 (emphasis added).

Commerce argues that the fact that the quantity tolerance level was changed, in whatever amount, demonstrates that the contract's material terms were subject to change and therefore not finally settled until the invoice date. The problem with this

argument is that it begs the question of whether any such changes were insignificant.

Nakornthai argues that the contract's amendments made changes that were minimal or insignificant. As a result, Nakornthai argues that it is appropriate to use the original contract date as the date of sale rather than the final invoice date.

As noted above, the record demonstrates that the original contract specified both an overall quantity tolerance and an individual, per item, tolerance level. One of the contract's amendments, however, removed the line-item quantity tolerance, giving Nakornthai greater leeway with respect to the products it shipped. Commerce examined Nakorthai's invoices and found that this leeway allowed Nakornthai to ship a larger amount of one item, and that this increase was large enough to fall outside the originally-specified line-item quantity tolerance level. Def.-Intervenor's Opp. Mem. 2. This increase appears to distinguish this case from the Sept. 28, 2001 determination in the original investigation, Final Results of Original Investigation, and accompanying Issues and Decision Mem. (Comment 9).

On the other hand, Nakornthai also argues that the contract amendment affected less than .1% of the total quantity of goods sold and shipped under the contract. Pl.'s Reply Br. 6. At the same time, the quantity actually shipped of the one changed line-item was 14.5% higher than the upper end of the originally-

specified tolerance level, and more than 25% above the specific line-item quantity for that product specified in the original contract.[10] Commerce did not discuss or make a finding with regard to this evidence, either on its own or when considered in light of the elimination of tolerance levels in the contract. Moreover, on this record, the court cannot conclude that Nakornthai has necessarily submitted sufficient evidence to establish that the contract date "better reflects the date on which" Nakornthai and its wholesaler set the material terms of sale. For example, it is not apparent to the court whether the variation in the quantities for one line-item is sufficient to affect "product mix" in any significant way or to alter the dumping margin. It is of course settled that the fact that the evidence could support two inconsistent conclusions does not mean that an agency's finding is not supported by substantial evidence, Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966), and the court will not substitute its own judgment for that of the agency. Here, however, the agency has not made a factual finding with regard to the significance of Nakorthai's evidence or the date the terms of the contract were essentially "established" in light of the evidence submitted. The

---

[10] That is, the "total line-item quantity actually shipped was [     ]MT, which exceeds the initial contract quantity tolerance limit of [  ]MT by slightly more than [ ] MT." Pl.'s Mot. 4.

agency's determination of this issue is therefore incomplete and must be remanded.

**D. Nakornthai's Failure to Exhaust is Administrative Remedies Precludes Judicial Review of Alternative Dates of Sale.**

In its briefs presented to the court, Nakornthai asks the court to consider alternative dates as a date of sale, and not limit its review to the contract date or the invoice date. Specifically, Nakornthai argues that, should the court find the contract date to be inappropriate as the date of sale, the court should consider using either the date on which the contract was last amended ("contract amendment date") or the date on which the goods shipped ("shipment date"), rather than uphold Commerce's use of the invoice date.

In rebuttal, both Commerce and U.S. Steel argue that, because Nakornthai failed to raise its alternative sales dates before Commerce, Nakornthai failed to exhaust its administrative remedies. Defendants argue that Commerce decided on the invoice date as between two choices: invoice date and contract date, and that the record amply supports the choice. As a result, they argue, alternative dates are not properly before the court.

As a judicially created doctrine, the requirement of exhaustion reflects courts' reluctance to usurp an agency's power by meddling in the agency's affairs before the issue is ripe for

judicial determination. See, e.g., Sandvik Steel Co. v. United States, 164 F.3d 596 (Fed. Cir. 1998); Ta Chen Stainless Steel Pipe v. United States, 28 CIT 627, 342 F. Supp. 2d 1191 (2004). Federal courts therefore usually require parties to exhaust their administrative remedies before appealing.

This Court has the benefit of specific statutory support for the exhaustion doctrine. See, 28 U.S.C. § 2637(d)("the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies.").

In determining, case-by-case, when exhaustion is "appropriate," the Court has "generally taken a strict view of the need for parties to exhaust their remedies by raising all arguments in a timely fashion so that they may be appropriately addressed by the agency." Ta Chen, 28 CIT at 644, 342 F. Supp. 2d at 1205; Pohang Iron and Steel Co. v. United States, 23 CIT 778, 792 (1999).

Here, the court begins its exhaustion analysis with Commerce's administrative procedures for challenging an antidumping determination. This procedure requires parties to submit a case brief that "must present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination or final results, including any arguments presented before the date of publication of the preliminary determination or preliminary results." 19 C.F.R. § 351.309(c)(2).  The Court recently noted that the requirement to present "all" relevant

arguments means that arguments that are omitted before the agency cannot be argued on appeal. <u>Carpenter Tech. Corp. v. United States</u>, 30 CIT ___, 452 F. Supp. 2d 1344 (2006).

Here, Nakornthai did submit a case brief to Commerce following the preliminary results. The issue, therefore, is whether that brief's general argument in favor of using a date other than the invoice date was sufficient to give Commerce notice of the specific alternatives that Nakornthai now raises on appeal, where those alternatives were not mentioned at the administrative level.

Several of the Court's precedents are instructive. In <u>Ta Chen</u>, for example, a Taiwanese producer and exporter of fittings submitted a case brief challenging Commerce's Constructed Export Price ("CEP"). <u>Ta Chen</u>, 342 F.Supp. 2d at 1205. The brief argued specifically that Commerce's calculation of the CEP adjustment was unsupported by substantial evidence. <u>Id.</u> Ta Chen also specifically challenged Commerce's decision to deny the company a CEP offset adjustment to normal value to reflect asserted level of trade differences between the home and U.S. markets. <u>Id.</u> at 1199, 1204. After the submission of Ta Chen's brief, Commerce  reopened the response period because there were specific issues to which Ta Chen had not responded. <u>Id.</u> at 1196. When Ta Chen submitted a revised brief to the agency, it had deleted its discussion of the CEP offset issue and had omitted documents on the reimbursement issue. <u>Id.</u> When Ta Chen raised these specific arguments on appeal before

the court, the court held that Ta Chen, in omitting these arguments from its revised brief, had failed to present them to Commerce before making them before the court. Id. at 1205. "Whatever may have been the merits" of these claims, the court said, they were "doomed by the company's failure to raise the issue before the Commerce Department in a timely fashion." Id. at 1205.

Paul Muller Industrie Gmbh & Co. v. United States is also informative here. Paul Muller Industrie Gmbh & Co. v. United States, 31 CIT __, 502 F. Supp. 2d 1271 (2007). In Paul Muller, Timken U.S. Corporation, a defendant-intervenor, argued broadly in its case brief that Commerce needed "to account for U.S. carrying costs incurred on an ex-factory basis, as it did for the home market side." Id. at 1274. Timken also "suggested that the sum of the time in inventory in the home market, the transit time, and the time in inventory in the U.S. would be a more accurate approach for the calculation." Id. The company also suggested "that Commerce consider the entered value as the cost of goods upon entry to the U.S." Id. On appeal before the court, however, Timken argued more specifically that for U.S. inventory, "the estimate of inventory cost must account for costs incident to the transaction between the producer and the U.S. affiliate such as transportation costs, duties, and brokerage fees." Id.

The court refused to allow these more specific arguments on appeal, finding that "Timken waived its right to raise the issue of

freight, duties, and brokerage fees by failing to raise the issue

before Commerce in the course of its review." <u>Id.</u> at 1275. The fact

that Timken "raised general issues regarding inventory carrying

costs is not adequate to apprise Commerce of what it would need to

specifically respond to regarding these additional issues," the

court held, and dismissed Timken's claims. <u>Id.</u>

   To the court, the present case appears similar to that in <u>Paul

Muller</u>. Nakornthai raised broad arguments before Commerce regarding

the propriety of using the invoice date as the date of sale, but did

not raise the specific alternatives it now seeks to raise before the

court. Nakornthai did not properly raise these alternatives before

Commerce, and may not now raise them on appeal because it has not

exhausted its administrative remedies with respect to these

alternative dates.[11]   Despite Nakornthai's failure to exhaust,

however, Commerce is still free on remand to determine, in

accordance with its regulations and based on the record, which date

"reflects the date on which the exporter or producer establish[ed]

the material terms of sale."

---

[11]Nakornthai also argues that even if it has failed in its
duty of exhaustion, such a requirement should be excused here
because the presentation of alternative dates involves a pure
matter of law. However, as the court analysis above has
demonstrated, the agency's choice of the invoice date over any
other alternative involves both legal and factual components.
Accordingly, the presentation of alternative dates does not
involve a pure matter of law.

### Conclusion

Accordingly, Plaintiff's Motion for Judgment on the Agency Record is denied-in-part and granted-in-part. The matter is remanded to the agency for further consideration in accordance with this opinion. Remand results are due by July 28, 2008. Comments on the remand results are due by August 18, 2008. Reply comments are due by September 10, 2008.

SO ORDERED.

/s/Donald C. Pogue
Donald C. Pogue, Judge

Dated: May 28, 2008
       New York, N.Y.

# NOTICE OF ENTRY AND SERVICE


This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.


Tina Potuto Kimble
Clerk of the Court


Date: _____     By: _____
                                                         Deputy Clerk