Slip Op. 09-27

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NAKORNTHAI STRIP MILL PUBLIC COMPANY LIMITED, | |
| Plaintiff, | |
| v. | Before: Pogue, Judge |
| | Court No. 07-00180 |
| UNITED STATES, | **PUBLIC VERSION** |
| Defendant, | |
| -and- | |
| UNITED STATES STEEL CORPORATION, | |
| Defendant-Intervenor. | |

## <u>OPINION</u>

[Commerce's second remand determination sustained.]

Dated: April 7, 2009

Hughes, Hubbard & Reed LLP (Kenneth J. Pierce, Robert L. LaFrankie, Victor S. Mroczka) for the Plaintiff.

Michael F. Hertz, Acting Assistant Attorney General; Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Jane C. Dempsey); Matthew D. Walden, Attorney, Of Counsel, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for the Defendant.

Skadden, Arps, Slate, Meagher & Flom LLP (Robert E. Lighthizer, John J. Mangan, Jeffrey D. Gerrish, Luke A. Meisner) for the Defendant-Intervenor.

**Pogue, Judge:** Plaintiff Nakornthai Strip Mill Public Co., Ltd.

("Nakornthai"),[1] Defendant United States (the "government") and Defendant-Intervenor U.S. Steel Corp. ("U.S. Steel") are before the court a third time following a second court-directed U.S. Department of Commerce ("Commerce") remand determination in this matter. See Final Results of Redetermination Pursuant to Second Remand, A-549-817, ADR 11/1/2004—10/31/2005 (Feb. 6, 2009) ("Second Remand Results"). In response to Commerce's Second Remand Results, Nakornthai again challenges Commerce's choice of the invoice date, rather than contract date, as the date of sale for the calculation of Nakornthai's antidumping duties.

Because Commerce's ultimate conclusion -- that Nakornthai has not established that the material terms of its contract were established on a date other than invoice date -- is based both on a reasonable legal interpretation of the applicable regulation and sufficient factual findings supported by substantial evidence, the court affirms Commerce's Second Remand Results.

## BACKGROUND

As a producer of hot-rolled carbon steel flat products ("hot-rolled steel") in Thailand, Nakornthai is subject to an antidumping order on its imports of hot-rolled steel into the United States. See Certain Hot-Rolled Carbon Steel Flat Products from Thailand, 66 Fed. Reg. 59,562 (Dep't Commerce Nov. 29, 2001) (notice of

---

[1] Nakornthai is now known as G J Steel Public Co. Ltd. For consistency, as the court has in its previous opinions, the court will continue to refer to the company under its former name.

antidumping duty order) ("Antidumping Duty Order").  From 2001 to

2007, as a result of the Antidumping Duty Order, Nakornthai paid

the separate "all others" duty rate of 3.86 percent on its imports.

See id. at 59,563.

In May 2007, following Commerce's publication of the

opportunity to request an administrative review of the Antidumping

Duty Order, see Antidumping or Countervailing Duty Order, Finding,

or Suspended Investigation, 70 Fed. Reg. 65,883 (Dep't Commerce

Nov. 1, 2005) (notice of opportunity to request administrative

review), U.S. Steel and Nucor Corp. ("Nucor") requested review for

the period of November 1, 2004 through October 31, 2005.  Commerce

granted this request, see Initiation of Antidumping and

Countervailing Duty Administrative Reviews and Request for

Revocation in Part, 70 Fed. Reg. 76,024 (Dep't Commerce Dec. 22,

2005), and, after publishing preliminary results of its review, and

inviting comments thereon by Nakornthai, U.S. Steel and Nucor,

revised the Antidumping Duty Order to calculate a Nakornthai-

specific dumping margin for the period of review (and a resulting

antidumping duty cash deposit rate for the next review period) of

8.23 percent.[2]  See Certain Hot-Rolled Carbon Steel Flat Products

---

[2] More thorough descriptions of the facts can be found in
this court's previous opinions in this matter. See Nakornthai
Strip Mill Pub. Co. v. United States, 587 F. Supp. 2d 1303 (CIT
2008) ("Nakornthai II"); Nakornthai Strip Mill Pub. Co. v. United
States, 558 F. Supp. 2d 1319 (CIT 2008) ("Nakornthai I").
Familiarity with these two opinions is presumed.

from Thailand, 72 Fed. Reg. 27,802, 27,803 (Dep't Commerce May 17,

2007) (final results and partial rescission of antidumping duty

administrative review) ("Final Results"); Issues & Decision

Memorandum, A-549-817, ADR 11/01/04-10/31/05 (May 7, 2007),

available at

http://ia.ita.doc.gov/frn/summary/THAILAND/E7-9526-1.pdf ("Decision

Memorandum"); Proprietary Arguments from the Issues and Decision

Memorandum for the Final Results of Certain Hot-Rolled Carbon Steel

Flat Products from Thailand, A-549-817, ADR 11/01/04-10/31/05 (May

7, 2007) ("Proprietary Memorandum").

       During the period of review, according to Nakornthai's

responses to Commerce's questionnaires, Nakornthai made one U.S.

sale of hot-rolled steel pursuant to a contract with a U.S.

wholesaler (the "original contract").  The original contract

specified certain terms, including both a total "quantity

tolerance" and "per item tolerance level" of products to be

shipped.[3]  After the original contract was signed, Nakornthai and

its wholesaler executed three changes in the contract: elimination

_____

       [3] The contract provided for the sale of a specific quantity,
[      ] MT, of hot-rolled steel products at a uniform unit net
price of [       ]. ("MT" connotes metric tons.) The contract
further provided for both an overall "quantity tolerance" of +/-
a specific percentage [    ] for the total quantity, and a
specific individual line item tolerance, or "per item tolerance
level," of +/- a specific percentage [    ]. ("Quantity
tolerance" refers to acceptable range of quantities to be
purchased, expressed as a number, plus or minus (+/-) a specified
percentage.)  The individual line items referred to specific
products, identified by size, quality and thickness.

Court No. 07-00180                                               Page 5

of the line item quantity tolerance level, changes to payment
terms[4] and amendments to delivery dates.[5]  Nonetheless, Nakornthai
claimed, and continues to claim, that these changes are immaterial
and did not affect the uniform net unit price or the total quantity
agreed to be purchased.

     At a certain point, Nakornthai issued commercial invoices to
the wholesaler.  The final invoice quantity, though changed
slightly from the total quantity specified in the original
contract, remained within the total quantity tolerance provided for
in the original contract.  In fact, the contract amendment affected
less that 0.1% of the total quantity of goods sold and shipped
under the contract, and each of the individual line item quantities
shipped were also within the original stated tolerance levels,
except for one single line item.  The quantity shipped of the
single, changed line item was 14.5% more than the upper end of the

---

     [4] The original contract's payment terms were changed from
total payment against a specified shipping receipt to payment of
a specified percentage [                    ] against a different
shipping receipt [                    ] and the
remaining [  ] payment against another [      ] receipt.  In
addition, Nakornthai originally reported a particular date, [
          ], as the payment date.  However, the record shows that
Nakornthai received payment on different dates, with [

                                    ].

     [5] The delivery date amendments involved changes to the letter
of credit expiry date and last shipment date on the letter of
credit.  Nakornthai changed the expiration date from [
   ] to [                 ].  Nakornthai also changed the last
shipment date from [                    ] to [                    ].

Court No. 07-00180                                            Page 6

original line item tolerance level and more than 25% above the

specific line item quantity for that product.

Faced with this record, Commerce made a "date of sale"

determination pursuant to its regulations:

> In identifying the date of sale of the subject
> merchandise or foreign like product, the
> Secretary normally will use the date of invoice, as recorded in the
> exporter or producer's records kept in the ordinary
> course of business. However, the Secretary may use a date
> other than the date of invoice if the Secretary is
> satisfied that a different date better reflects the date
> on which the exporter or producer establishes the
> material terms of sale.

19 C.F.R. § 351.401(i).[6]

Applying its regulation in Nakornthai's case, despite the

limited nature of the quantity changes, Commerce concluded that the

elimination of the line item tolerance levels demonstrated that the

contract's material terms were not settled until the invoice date.

According to Commerce, the elimination of the line item quantity

tolerance level materially changed the original contract, because

the elimination, at least potentially, allowed Nakornthai to make

---

[6] Commerce has explained its use of the presumption in
support of the use of invoice date: "in many industries, even
though a buyer and seller may initially agree on terms of sale,
those terms remain negotiable and are not finally established
until the sale is invoiced." Antidumping Duties; Countervailing
Duties, 62 Fed. Reg. 27,296, 27,349 (Dep't Commerce May 19, 1997)
(final rule).  Thus, the party challenging this presumption bears
the burden to prove that a different date "better reflects" the
parties establishment of material contract terms and "must submit
information that supports the use of [the] different date." Id.;
see also Allied Tube & Conduit Corp. v. United States, 25 CIT 23,
25, 132 F. Supp. 2d 1087, 1090 (2001).

quantity changes affecting "product mix" and "resulting in [

 ] products being shipped." <u>Proprietary Memorandum</u> 14.  Given this

finding, Commerce did not address the materiality of the changes to

payment and delivery terms, as it deemed these issues "moot." <u>Id.</u>

In response, and in accordance with 19 U.S.C §§

1516a(a)(2)(i)(I), 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c),

Nakornthai filed this action, to contest Commerce's determinations

in calculating Nakornthai's specific antidumping duty rate.

Specifically, as is relevant here, Nakornthai claimed that Commerce

erred by using the invoice date, instead of the contract date, as

the date of sale to determine its weighted average dumping margin

for the period covered by the administrative review and the

assessment rate going forward.[7] Nakornthai argued to Commerce and

argues before the court that Commerce should adhere to its "long-

standing practice" of using the contract date as the date of sale,

because, according to Nakornthai, the record reveals that the

contract date "better reflects the date on which the exporter or

producer establishe[d] the material terms of sale."

---

[7] Commerce's use of date of invoice instead of contract date
affects the calculation of Nakornthai's dumping margin. <u>See</u> 19
C.F.R. § 351.401(a).  As noted in <u>Nakornthai I</u>, "[t]he
identification of a 'date of sale' for U.S. price may affect
[Commerce's] comparison with sales in the foreign or 'home'
market, for example, if exchange rates are changing during the
period of review." <u>Nakornthai I</u>, 558 F. Supp. 2d at 1321 n.1.

### I. Nakornthai I

In Nakornthai I, the court affirmed Commerce's initial legal interpretation, holding that Commerce's identification of line item quantities as a "material term of sale" of Nakornthai's contract was based on the agency's reasonable interpretation of its own regulation. Nakornthai I, 558 F. Supp. 2d at 1327. In addition, the court refused to consider alternative dates of sale, other than contract date, as Nakornthai had failed to exhaust its administrative remedies on this issue. Id. at 1329-30.

However, the court held that Commerce's factual findings on the finality of the terms of sale were incomplete, and remanded the issue back to the agency for reconsideration. Id. at 1328-29. Noting that Commerce, in applying it's date-of-sale regulation, "weighs the evidence presented and regularly determines the significance of any changes to the terms of sales involved", id. at 1327, the court stated that "Commerce did not discuss or make a finding with regard to this [i.e., Nakornthai's] evidence [as to the quantities of goods actually ordered and delivered], either on its own or when considered in light of the elimination of the tolerance levels in the contract." Id. at 1328. Therefore, the court could not determine whether the variation in quantities for one line item was sufficiently significant, e.g., either to affect "product mix" in a significant way or to alter the dumping margin, to meet the regulatory standard that the terms of the contract not

be essentially "established." Id. As such, the court remanded the
case back to Commerce to make a factual finding "with regard to the
significance of Nakornthai's evidence" and whether "the date the
terms of the contract were essentially 'established' [at the date
of contract] in light of the evidence submitted." Id. at 1328-29.

## II. Nakornthai II

On remand, Commerce reconsidered its original determination,
but again chose to use the date of invoice rather than the date of
contract as the date of sale. See Final Results of Redetermination
Pursuant to Remand, A-549-817, ADR 11/1/2004—10/31/2005 (July 28,
2008) ("First Remand Results"). Commerce distinguished
Nakornthai's case from prior instances where Commerce found changes
to contractual terms of sale insignificant, and thus used the
contract date for date of sale. Id. 3-4 (discussing Certain
Cut-to-Length Carbon Steel Plate from Romania, 72 Fed. Reg. 6,522
(Dep't Commerce Feb. 12, 2007)(notice of final results of
antidumping duty administrative review and final partial
rescission) and accompanying Issues and Decision Memorandum, A-485-
803, ADR 08/01/2004-07/31/2005 (Feb. 2, 2007), available at
http://ia.ita.doc.gov/frn/summary/ROMANIA/E7-2216-1.pdf ("Romanian
Plate"); Circular Welded Non-Alloy Steel Pipe from the Republic of
Korea, 63 Fed. Reg. 32,833 (Dep't Commerce June 16, 1998) (final
results of antidumping duty administrative review)). In addition,
Commerce refused to address Nakornthai's proposed alternative dates

of sale. Id. 11-12.  The court sustained these two determinations. Nakornthai II, 587 F. Supp. 2d at 1308-09, 1311-12.

However, Commerce seemingly ignored the court's specific instructions regarding analysis of Nakornthai's particular evidence, declaring that the change to the specific quantity shipped "is not [] relevant" and concluding that the "relevant change" was the elimination of the tolerance levels from the original contract. First Remand Results 5.  Rather, Commerce merely restated its prior hypothetically-based reasoning previously rejected by the court,[8] and therefore the court remanded again as to Commerce's factual findings on date of sale. Nakornthai II, 587 F. Supp. 2d at 1309.  The court instructed Commerce to, on remand:

> determine [in accordance with its standard practice], and explain its rationale, as to whether the evidence presented by Nakornthai of the change in the quantity shipped was actually of any significance, and whether, in context, this change materially affected the date that the terms of the contract were essentially established.

Id. at 1311.

---

[8] "Commerce determined that the mere removal of the [line item] quantity tolerance from the contract was significant because it 'provided [Nakornthai] with the flexibility to affect the product mix and, in turn, the overall dumping margin,' because 'the product mix . . . is used for matching purposes and the overall margin calculation.' Commerce then set forth a hypothetical example demonstrating how the tolerance removal 'could conceivably' permit Nakornthai to alter product combinations in an effort to impact the overall dumping margin. While Commerce did state that 'it is reasonable to characterize the quantity change as significant,' the agency did not provide a reasoned explanation on this issue, and immediately reiterated that this analysis '[was] not the basis' for its determination." Nakornthai II, 587 F. Supp. 2d at 1309 (citations omitted).

### III. Commerce's Second Remand Results

Pursuant to the court's second remand, Commerce once again re-examined its date of sale analysis. See Second Remand Results 1, 3. Commerce first determined "that the change in aggregate quantity shipped [by Nakornthai] is not, on its own, significant and does not, by itself, materially affect the date that the terms of contract were essentially established." Id. 3. Commerce explained that, according to its practice, differences between aggregate quantity contracted for and shipped, as long as these differences fall within the overall quantity tolerance, do not constitute changes to material contractual terms. Id. 5-6 (citing Romanian Plate; Certain Large Diameter Carbon and Alloy Seamless Standard, Line and Pressure Pipe From Mexico, 65 Fed. Reg. 39,358 (Dep't Commerce June 26, 2000) (notice of final determination of sales at less than fair value)).[9]

But Commerce continued:

> [However,] when the change in aggregate quantity is considered in the context of ongoing amendments to material contract terms subsequent to [Nakornthai's] original contract date, including the elimination of the line item quantity tolerance from [Nakornthai's] original contract and subsequent amendments to payment and delivery terms, record evidence demonstrates a continuum of change to material contract terms that fails to overcome [Commerce's] regulatory presumption that invoice date is the appropriate date of sale.

---

[9] Because this determination is inconsistent with Commerce's consideration of line item quantity levels, discussed supra, the court expresses no view on the reasonableness of this asserted "standard practice."

Id. 3-4.  In other words, Commerce determined that "the context in
which [the within-tolerance change] occurred demonstrates that the
terms of [Nakornthai's] U.S. sales contract were not set in the
original contract." Id. 7.

    This "context" as considered by Commerce has several elements.
First, Commerce noted that, unlike the record in Romanian Plate,
"the record in this case lacks any similar evidence [of the
parties' conclusion of a final agreement regarding terms of sale]
supporting [Nakornthai's] proposal that [Commerce] rely upon the
contract date." Id. 5.[10]  Second, Commerce identified a "series of
changes to the material terms of sale" including (1) the
elimination of the line item quantity tolerance, as well as (2)
changes to payment terms and (3) amendments to delivery terms, that
demonstrate that Nakornthai and its U.S. customer "did not share an
agreement on final contract terms until the invoice date." Id. 7.

    With respect to the elimination of the line item quantity
tolerance level, Commerce stated that this "by itself" was material
to its date of sale analysis because "it shows that parties did not
share an agreement on the final terms of sale on the original

_____

    [10] The Romanian Plate respondent's evidence included "the
specific language of the order acknowledgment -- language that
Commerce deemed to definitively state 'that there can thereafter
be no changes in the terms of sale' -- as well as affidavits from
U.S. customers 'declaring that the order acknowledgments are
understood as the parties' final agreement on quantities and
prices ordered.'" Nakornthai II, 587 F. Supp. 2d at 1307 (quoting
Romanian Plate 7).

contract date." Id. 13.  Commerce also found that this change was

"commercially significant" because Nakornthai's original contract

> stated that a certain quantity of each item would be
> shipped, and that a [line item] quantity beyond [  ]% of
> the [line item] quantity tolerance would constitute a
> breach of contract.  Therefore, the final sale quantity
> . . . would have resulted in a breach of contract had the
> original contract not been subsequently amended.
> Amending the original contract to allow for a final
> shipment that would have constituted a breach of the
> original contract is a "significant" amendment for
> commercial purposes.

Id. (citation omitted).

Similarly, Commerce also concluded that, "as a factual matter,

the amendments to payment and delivery terms demonstrate that the

parties did not share an agreement concerning these material terms

at the time of their original contract." Id. 8. Commerce determined

that the fact that the payment and delivery terms, considered

"material" in Commerce's practice, were subject to amendment "is

sufficient to demonstrate their materiality . . . ." Id. 13.  But

Commerce further noted that "the record demonstrates that [the

amendments to payment and delivery terms] impacted [sic] the sales

transactions at issue." Id. 14.  More particularly, the payment

term change allowed Nakornthai to receive a certain percentage of

its payment at an earlier point in time[11] than specified in the

_____

[11] Commerce relied upon Nakornthai's reported payment date of
[                ] in determining Nakornthai's "credit expense
calculation." Def.'s Resp. to Pl.'s Comments Regarding the Second
Remand Determination ("Def.'s Resp.") 12.  The credit expense "is
the interest expense incurred (or interest revenue foregone)
between shipment of merchandise to a customer and receipt of

original contract, and the changes to the letter of credit's
expiration and last shipment dates[12] gave Nakornthai [ ] additional
days to ship the subject merchandise to its customer and still be
entitled to full payment. Id. Accordingly, these changes affected
"the credit calculation for [Nakornthai's] U.S. sales used to
derive [its] weighted-average dumping margin." Id.[13]

_____

payment from the customer." Rebuttal to Pl.'s Comments on the
Dep't of Comm.'s Second Remand Results 16.

   [12] Nakornthai reported, and Commerce relied upon, shipment
dates [                                        ] in
determining Nakornthai's "credit expense calculation." Moreover,
Nakornthai provided certain specified [     ] receipts that show
that its shipments were commenced and completed on certain dates,
from [          ] to [                 ]. Thus, according
to Commerce, "[          ] of Nakornthai's shipments to the
United States were conducted in accordance with the shipment
terms present upon invoice date." Def.'s Resp. 12.

   [13] According to Commerce:

   The credit expense calculation functions as an
   adjustment in Commerce's determination of an
   antidumping margin that is aimed at valuing, in part,
   the opportunity costs involved with the timing of the
   transactions at issue. Commerce's Antidumping Manual
   explains that the most common adjustment for
   differences in circumstances of sale is for differences
   in credit costs, and that this adjustment is necessary
   because there "is usually a period of time between the
   shipment of merchandise to a customer and payment for
   the merchandise." The manual further states that this
   adjustment is required "to account for the opportunity
   cost associated with the loss of the use of monies
   involved," and that in "all instances where the
   respondent provides shipment and payment dates, we use
   this information to calculate the actual number of days
   credit is outstanding."

   In this case, Nakornthai reported its credit
   expenses to Commerce using the following formula:

Court No. 07-00180                                          Page 15

Finally, Commerce again refused to consider any alternate dates proposed by Nakornthai and limited its date of sale analysis to the contract and invoice dates. <u>Id.</u> 15.  Accordingly, Commerce reaffirmed its conclusion to use invoice date. <u>Id.</u>

## **STANDARD OF REVIEW**

As in reviewing earlier Commerce determinations in this case, the court reviews remand determinations for compliance with the court's remand order. <u>See</u> <u>NMB Sing. Ltd. v. United States</u>, 28 CIT 1252, 1259-60, 341 F. Supp. 2d 1327, 1333-34 (2004); <u>Olympia Indus., Inc. v. United States</u>, 23 CIT 80, 82, 36 F. Supp. 2d 414,

---

> CREDITU {credit expenses} = GRSUPRU {gross unit price} x U.S. dollar interest rate X ((PAYDATEU {payment date} - SHIPDATU {shipment date})/365)

> Therefore, by definition, the shipment date or the payment date . . . reported by Nakornthai affects the credit calculation.  Because Nakornthai's own reported shipment and payment dates, as well as the shipments and payments between Nakornthai and its United States customer, conform with the contract terms present at the time of the invoice date, Commerce's calculation of Nakornthai's credit expenses reflects Nakornthai's adherence to material contract terms present at the time of the invoice date and not the terms present in the original contract.

> <u>Def.'s Resp.</u> 13-14 (quoting <u>Import Administration Antidumping Manual</u>, Ch. 8, 22-23, <u>available at</u> http://ia.ita.doc.gov/admanual/index.html (last visited Mar. 19, 2009)) (citations omitted).  Commerce did not provide a specific calculation of this effect on the dumping margin, as "Commerce does not, as a matter of practice, calculate unofficial antidumping margins to demonstrate the difference between the actual antidumping margin and alternative margins that might result from different factual scenarios." <u>Def.'s Resp.</u> 14.

416 (1999).  Moreover, again, the agency's legal determinations on
remand must be in accordance with law and its factual findings must
be supported by substantial evidence. 19 U.S.C. § 1516a(b)(1)(B);
see Huaiyin Foreign Trade Corp. v. United States, 322 F.3d 1369,
1374 (Fed. Cir. 2003); AG der Dillinger Hüttenwerke v. United
States, 28 CIT 94, 95, 310 F. Supp. 2d 1347, 1349 (2004).
"Substantial evidence is 'such relevant evidence as a reasonable
mind might accept as adequate to support a conclusion.'" Huaiyin
Foreign Trade Corp., 322 F.3d at 1374 (citations omitted).

## DISCUSSION

Commerce's Second Remand Results comply with the court's
remand orders in Nakornthai I and Nakornthai II.  At the same time,
the court cannot affirm Commerce's conclusion that the elimination
of a line item quantity tolerance level from the contract
constituted a significant change that materially affected
Nakornthai's contract.  Nonetheless, based on Commerce's further
analysis of the significance of the particular evidence presented
in this case, the court otherwise deems Commerce's factual findings
in its Second Remand Results to be supported by substantial
evidence and its interpretation of its own regulation to be in
accordance with law.

## I. The Court Cannot Affirm Commerce's Conclusion Regarding Nakornthai's Elimination of the Line Item Quantity Tolerance Level

Despite Commerce's conclusion, based on its established

practice, that differences in line item quantities, so long as the
overall quantity is within the overall quantity tolerance level,
are not significant, Commerce nonetheless concluded that the
elimination of the line item tolerance from the contract was
"material" in this case. Previously, in <u>Nakornthai I</u> and
<u>Nakornthai II</u>, the court rejected Commerce's proffered hypothetical
reasoning that this contractual change potentially allowed
Nakornthai to manipulate the "product mix." Now, as explained in
its <u>Second Remand Results</u>, Commerce presents a different rationale.
Commerce reasons that, "[a]s a factual matter, the elimination of
the line item quantity tolerance demonstrates that the parties did
not share an agreement concerning quantity, a material contract
term, at the time of their original contract." <u>Second Remand
Results</u> 7. Commerce based its conclusion upon the court's previous
holding that Commerce can reasonably consider the change to a line
item quantity tolerance a "material" contract term, <u>see</u> <u>Nakornthai
I</u>, 558 F. Supp. 2d at 1327, and upon the fact that the shipped
quantity of the line item was 14.5% more than the upper end of the
original tolerance level and more than 25% above the specific line
item quantity for that product. <u>Second Remand Results</u> 7.

   Nakornthai argues that Commerce, in employing "flawed"
reasoning, has not followed the court's remand instructions with
regard to its analysis of the elimination of the line item quantity
tolerance level. <u>Pl.'s Comments on the Dep't of Comm.'s Second</u>

Remand Results Pursuant to Slip Op. 08-128 ("Pl.'s Comments") 1.
More specifically, Nakornthai charges that Commerce once again
relied on speculation and hypotheticals, as there was no actual
breach of contract. Id. 5-6. Nakornthai also attacks Commerce's
conclusions, that the amendment demonstrates that the contract was
subject to change, as "absurd and illogical." Id. 9.

Nakornthai's position, though somewhat overstated, has merit.
Commerce has once again attempted to make a factual finding of
"potential" significance regarding the line item contractual
quantity change, while at the same time making a factual finding
that the change in quantities, in total, are not significant.
Because of this inconsistency, Commerce has, with regard to this
issue, again failed to provide a non-arbitrary, reasoned basis for
its conclusion. Commerce argues that the elimination of the line
item tolerance level, because that tolerance level is, as a legal
matter, a material contract term, in and of itself materially
alters the contract. But, as Nakornthai points out, this
determination is directly contrary to the court's instructions in
Nakornthai I. See Nakornthai I, 558 F. Supp. 2d at 1328 ("Commerce
argues that the fact that the quantity tolerance level was changed,
in whatever amount, demonstrates that the contract's material terms
were subject to change and therefore not finally settled until the
invoice date. The problem with this argument is that it begs the
question of whether any such changes were insignificant.").

Nor, as the court has also previously instructed, can Commerce use speculative or hypothetical reasoning to support its conclusions. See Nakornthai II, 587 F. Supp. 2d at 1310 ("Commerce's use of hypotheticals, generalizations . . . and conditional language suggesting possible distortions in antidumping calculations offer conjecture rather than a reasoned explanation founded on substantial evidence." (quoting Hynix Semiconductor, Inc. v. United States, 27 CIT 1719, 1722, 295 F. Supp. 2d 1365, 1369 (2003), rev'd in part, 424 F.3d 1363, 1370 (Fed. Cir. 2005))). Thus, Commerce's hypothetical scenario, indicating that Nakornthai -- had it and its U.S. customer not amended the contract -- would have breached the contract when delivering its particular quantity of the relevant line item, is of limited persuasiveness. Because it is Commerce's practice to disregard changes that are not significant, see Nakornthai II, 587 F. Supp. 2d at 1309, Commerce cannot simultaneously rely on contractual changes that it has found insignificant to claim that such changes demonstrate that a contract's terms are not established.

Moreover, Commerce's argument is circular. Commerce contends that, because the contract was amended, the amendment was "commercially significant." Had the line item quantity shipped fallen within the original line item quantity tolerance, i.e., had the amount shipped been consistent with the original contractual terms, Nakornthai would have had no need to amend the contract in

the first place. Nonetheless, an amendment is not commercially significant simply because it changes a contractual term, even if that term is material.

Because Commerce, in making its date of sale determination, must, in accordance with its own regulation, make a factual determination with regard to whether the material terms were not set until invoice, and because Commerce's own practice in making such a determination is to disregard changes that are insignificant, the record must contain evidence sufficient to support the finding that the change to the material terms represented in the contract was significant. Commerce still has not done so here with regard to the line item quantity tolerance level and, thus, Commerce has not demonstrated to the court that its determination of significance of the elimination of the line item quantity tolerance level is supported by substantial evidence.

## II. Commerce Nonetheless Provides Substantial Evidence to Support Its Decision

However, the court finds other reasons to sustain Commerce's Second Remand Results. As a general matter, Commerce maintained that evidence, other than differences between contracted-for and shipped quantities, demonstrates that Nakornthai's contract was subject to change. Commerce noted that Nakornthai has not provided evidence, such as that presented in Romanian Plate, that would warrant deviation from its presumption of using invoice date as date of sale. Second Remand Results 5. In addition, Commerce noted

that it regularly considers payment and delivery terms as material
terms of sale, id. 7 (citing SeAH Steel Corp. v. United States, 25
CIT 133, 134 (2001)), and concluded that Nakornthai's amendments to
payment and delivery terms "demonstrate that the parties did not
share an agreement concerning these material terms at the time of
their original contract." Id. 8.

    Nakornthai first takes issue with Commerce's statement that
payment and delivery terms are generally considered by Commerce as
"material," citing Certain Hot-Rolled Carbon Steel Flat Products
from Thailand, 66 Fed. Reg. 49,622 (Dep't Commerce Sept. 28, 2001)
(notice of final determination of sales at less than fair value).
Commerce responds that its date of sale practice has "evolved," and
that it "now considers, among other contractual terms, delivery and
payment terms as material terms of sale." Def.'s Resp. 10.

    The court accepts Commerce's reasonable interpretation of its
regulatory practice and notes that this interpretation is supported
by recent Commerce decisions. See, e.g., Issues & Decision
Memorandum for Stainless Steel Sheet and Strip in Coils from Taiwan
(final results of the fourth antidumping administrative review), A-
583-831, AD/CVD 7/1/02-6/30/03 15 (Feb. 7, 2005), available at
http://ia.ita.doc.gov/frn/summary/taiwan/E5-631-1.pdf   ("The
Department has interpreted 'material terms of sale' to include
price, quantity, and payment terms . . . ."); Certain Cold-Rolled
Flat-Rolled Carbon-Quality Steel Products from Brazil, 65 Fed. Reg.

5,554, 5,575 (Dep't Commerce 2000) (final determination) (payment

terms); Issues & Decision Memorandum for Cold-Rolled Flat-Rolled

Carbon Quality Steel Products from Turkey, A-489-808, POI 1998-99

Date of Sale cmt. 1 (Mar. 21, 2000), available at

http://ia.ita.doc.gov/frn/summary/turkey/00-6992-1.txt (payment

terms). Therefore, the court finds Commerce's legal conclusion

that payment and delivery terms are "material" to be in accordance

with law.

Second, according to Nakornthai, Commerce failed to make a

significance finding for the payment term change or the delivery

term change. Nakornthai charges that Commerce's analysis on these

terms' affect on Nakornthai's credit calculation is also "purely

conjectural," as

> [n]owhere does Commerce explain exactly how this is so,
> or how such minor changes to secondary terms of sale are
> otherwise "significant" to any aspect of the actual
> dumping calculation. In fact, Commerce never determines
> whether [Nakornthai] used additional days or received
> payment any earlier, nor has Commerce analyzed whether
> there was any actual impact on its dumping calculation.
> Not surprisingly, Commerce provides no citation to the
> record on its claim because there was no impact on the
> margin.

Pl.'s Comments 7. For the same reasons stated above with regard to

the quantity tolerance level, the court cannot affirm Commerce's

finding that merely because these material contractual terms were

amended, such amendments in and of themselves demonstrate that the

contract was subject to change.

Despite this deficiency, Commerce also made the requisite

factual findings of significance with regard to the change in payment and delivery terms. Commerce's decision has sufficiently demonstrated to the court that the payment and delivery terms affected the sales transaction in a significant way, that is, that these changes significantly affected the terms of Nakornthai's contract. Moreover, this demonstration is supported by substantial evidence. For example, the payment term change allowed Nakornthai to receive a significant portion, [    ], of its payment at an earlier point in time than specified in the original contract, and the changes to the letter of credit's expiration and last shipment dates gave Nakornthai [  ] additional days to ship the subject merchandise to its customer while still being entitled to full payment. Id. Indeed, "[          ] of Nakornthai's shipments to the United States were conducted in accordance with the shipment terms present upon invoice date." Supra note 12. In turn, these amendments changed the credit expense calculation used to compute Nakornthai's dumping margin for the period of review.[14]

Based on Commerce's findings and reasoned analysis regarding the delivery and payment terms of Nakornthai's contract, the court

---

[14] Note that the court here makes only a substantial evidence determination. The court does not conclude that an affect on the dumping margin is a necessary condition for a finding of significance. Nor does the court conclude that an affect on the dumping margin is necessarily sufficient for a finding of significance. Rather, the court concludes that the agency's finding of significance here is based on a reasonable interpretation of the record evidence.

Court No. 07-00180                                                    Page 24

concludes that Commerce's conclusion in the <u>Second Remand Results</u>
-- that Nakornthai has not established that the material contract
terms were established on a date other than invoice date -- is
based on a reasonable interpretation of the "date-of-sale"
regulation and on sufficient factual findings that are supported by
substantial evidence.

### <u>CONCLUSION</u>

Therefore, upon consideration of the pending motions before
the court, in accordance with this opinion, it is hereby:

ORDERED that the Department of Commerce's second remand
determination is sustained. Judgement will be entered accordingly.


                                          /s/ Donald C. Pogue
                                         Donald C. Pogue, Judge


Dated: April 7, 2009
       New York, New York

Slip Op. 09-27

UNITED STATES COURT OF INTERNATIONAL TRADE

NAKORNTHAI STRIP MILL PUBLIC COMPANY
LIMITED,

                              Plaintiff,

                v.                          Before: Pogue, Judge

                                            Court No. 07-00180
UNITED STATES,
                                            **PUBLIC VERSION**
                              Defendant,

                -and-

UNITED STATES STEEL CORPORATION,

                              Defendant-
                              Intervenor.

<u>**Judgment**</u>

     This action having been duly submitted for decision, and the
court, after due deliberation, having rendered a decision herein,
now, in conformity with that decision, it is hereby

     ORDERED that Commerce's <u>Final Results of Redetermination
Pursuant to Second Remand</u>, A-549-817, ADR 11/1/2004—10/31/2005
(Feb. 6, 2009) are affirmed, and it is further

     ORDERED that entries of merchandise that are affected by
these Final Results shall be liquidated in accordance with the
final court decision in this action.


                                    /s/ Donald C. Pogue
                                   Donald C. Pogue, Judge


Dated: April 7, 2009
       New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____        By: _____
                                                          Deputy Clerk